**In re HAWAIIAN & GUAMANIAN CABOTAGE ANTITRUST LITIGATION.**

This Document Relates to: All Cases.

No. 08–md–1972 TSZ.

United States District Court,
W.D. Washington,
at Seattle.

Aug. 18, 2009.

Allen Steyer, Simon R. Goodfellow, Steyer Lowenthal Boodrookas Alvarez & Smith LLP, Laurence D. King, Linda M. Fong, Kaplan Fox & Kilsheimer LLP, Bruce L. Simon, Clifford H. Pearson, Daniel Warshaw, Esther L. Kilsura, Pearson Simon Warshaw & Penny LLP, Guido Saveri, Richard Alexander Saveri, Saveri & Saveri Inc., Joseph M. Alioto, Alioto Law Firm, Christopher L. Lebsock, Jon T. King, Michael Lehmann, Arthur N. Bailey, Hausfeld LLP, Craig C. Corbitt, Francis Onofrei Scarpulla, Patrick Bradford Clayton, Zelle Hofmann Voelbel Moason & Gette LLP, Joseph Marid Patane, Law Office of Joseph M. Patane, Lauren Clare Russell, Mario Nunzio Alioto, Trump Alioto Trump & Prescott LLP, San Francisco, CA, Dennis Stewart, Jennifer Anne Kagan, Sarah Pickeral Weber, Hullett Harper Stewart LLP, Christopher M. Burke, Scott & Scott LLP, Bonny E. Sweeney, David W. Mitchell, Thomas J. O'Reardon, II, Coughlin Stoia Geller Rudman & Robbins, San Diego, CA, Jay S. Cohen, Jonathan M. Jagher, William G. Caldes, Spector Roseman Kodroff & Willis PC, Anthony J. Bolognese, Bolognese & Associates LLC, Merrill G. Davidoff, Ruthane Gordon, Berger & Montague, PC, Philadelphia, PA, John McCarthy, Somers Point, NJ, John Murdock, Murdock & Goldenberg Schneider & Groh LPA, Cincinnati, OH, Marc Howard Edelson, Edelson & Associates LLC, Doylestown, PA, Philip A. Steinberg, Bala Cynwyd, PA, Kevin Bruce Love, Michael E. Criden, Hanz Criden & Love PA, South Miami, FL, Robert J. Kaplan, Kaplan Fox & Kilsheimer LLP, Seth R. Gassman, Cohen Milstein Hausfeld & Toll PLLC, Hollis Lee Salzman, Labaton Sucharow LLP, New York, NY, Glenn J. Stanford, Tam & Stanford, John S. Edmonds, Joy S. Omonaka, Ronald J. Verga, Edmonds & Verga, Honolulu, HI, J. Paul Sizemore, Jennifer Lenze, Thomas V. Girardi, Girardi & Keese, Edward Woords, Drier Stien Kahabrowne Woods George, Walter J. Jack, Engstrom Lipscombe & Lack, Brian S. Kabateck, Richard L. Kellner, Kabateck Brown Kellner LLP, Peter George Safirstien, Jeff S. Westerman, Milberg, Los Angeles, CA, Steve W. Berman, Anthony D. Shapiro, Ronnie S. Spiegel, Hagens Berman Sobol, Emillia L. Sweeney, Carney Badley Spellman, Seattle, WA, Christina L. Beatty-Walters, N. Robert Stoll, Stoll Stoll Berne Lokting Shlac-

ter, Portland, OR, Ara Ray Jabagchourian, Joseph W. Cotchett, Nanci E. Nishimura, Steven Williams, Stuart G. Gross, Cotchett Pitre Simon and McCarthy, Burlingame, CA, Eric M. George, Michael A. Bowse, Drier Stien Kahan Growne Woods George LLP, Beverly Hills, CA, Norman E. Siegel, Stueve Siegle Hanson LLP, Kansas City, MO, Paul Novak, Milberg LLP, Detroit, MI, John Charles Evans, Specter Specter Evans & Manogue PC, Pittsburgh, PA, Derek G. Howard, Gilmur Roderick Murray, Murray & Howard LLP, Larkspur, CA, Benjamin Doyle Brown, Michael D. Hausfeld, Cohen Milstein Hausfeld & Toll, Washington, DC, William Timothy Needham, Jansen Malloy Needham Morrison & Reinholsten LLP, Eureka, CA, Douglas A. Millen, Robert J. Wozniak, Sreven A. Kanner, William H. London, Freed Kanner London & Millen LLC, Bannockburn, IL, Harry Shulman, The Mills Law Firm, San Rafael, CA, Edward L. Birk, Michael B. Bittner, Marks Gray PA, Jacksonville, FL, Michael I. Fistel, Jr., Holzer, Holzer & Fistel, Llc, Atlanta, CA, Daniel C. Hedlund, Gustafson Gluek PLLC, Elizabeth R. Odette, Richard A. Lockridge, W. Joseph Bruckner, Lockridge Grindal Nauen, Minneapolis, MN, Alex C. Turan, Montura Law Group, Walnut Creek, CA, Donald Chidi Amamgbo, Amamgbo & Associates, Oakland, CA, Reginald Terrell, The Terrell Law Group, Richmond, CA, for Robert H. Steinberg, Acutron, Inc., 50th State Distributors, Inc., Versa Dock Hawaii LLC, Taste of Nature Inc., Next Transportation, LLC, Rhythm of Life Cosmetics Inc., Curtis Brunk, Winkler Woods LLC, Joshua Wagner, E & M International Transport Inc., Laura Cutler, SJ Venture Group LLC, Alpha Freight & Transport International, Inc., Jay Inouye, Brian Foster, Scott Jackson, Ruthanne Jackson.

Michael Cosman, pro se.

Eric Chase Roberson, McGuire Woods, LLP, Jacksonville, FL, for Alpha Freight & Transport International, Inc., Horizon Lines, LLC, Horizon Logistics, LLC, Crowley Maritime Corporation.

George A Nicoud, III, Joel Steven Sanders, Rachel S. Brass, Rebecca Justice Lazarus, Darin M. Sands, Gibson Dunn & Crutcher, San Francisco, CA, Amy B. Manning, Angelo M. Russo, Richard J. Rappaport, Tammy L. Adkins, Mcguire Woods, Chicago, IL, Craig D. Bachman, Lane Powell, Portland, OR, Darrel Christopher Menthe, Mcguire Woods LLP, Los Angeles, CA, Larry Steven Gangnes, Milo Petranovich, James B. Stoetzer, Lane Powell PC, Seattle, WA, James W McCready, III, Seipp Flick & Kissane, Miami, FL, Cristine M. Russell, Rogers Towers, PA, James M. Riley, Rogers Towers, PA, Scott David Richburg, Foley & Lardner, LLP, Jacksonville, FL, Timothy Joseph Armstrong, Coral Gables, FL, for Matson Navitgation Co Inc., Alexander & Baldwin Inc., Horizon Lines, LLC, Horizon Lines Holding Co., Crowley Maritime Corporation, Sea Star Lines, LLC, Trailer Bridge, Inc., Crowley Liner Services, Inc.

Brent Snyder, John Terzaken, III, Michael L. Whitlock, U.S. Dept of Justice, Anittrust Division, National Criminal Enforcement Section, Washington, DC, for John Terzaken.

## ORDER NO. 5: Dismissal With Leave to Amend

THOMAS S. ZILLY, District Judge.

THIS MATTER comes before the Court on defendants' joint motion, docket no. 86, to dismiss the Consolidated Class Action Complaint, docket no. 69 (the "Consolidated Complaint"), pursuant to Rule 12(b)(6). The Court has reviewed all papers filed in support of and in opposition to the motion and has considered the oral arguments of counsel presented on July 29, 2009. Hav-

ing previously taken the matter under advisement, the Court now enters the following Order.

### Background

Plaintiffs, purchasers of shipping services between the continental United States and Hawaii, Guam, or both, allege that defendants, providers of such shipping services, violated Section 1 of the Sherman Act,[1] by colluding to simultaneously increase fuel surcharges, by sharing vessel capacity, and by conspiring not to enter into extra-tariff rate agreements with customers. These assertions of anticompetitive activities in the Hawaii and Guam ocean trade were initially made by individual plaintiffs in separate cases filed in different districts, nineteen of which were transferred to this Court by the Multidistrict Litigation ("MDL") Panel pursuant to 28 U.S.C. § 1407. The transferred cases were consolidated for pretrial purposes with eight similar cases originally filed in this district. *See* Order No. 3 (docket no. 38). Pursuant to the agreement of the parties, plaintiffs were permitted to file the Consolidated Complaint now at issue. *See id.* at ¶ 4.

According to the Consolidated Complaint, plaintiffs are individuals or entities that directly purchased from defendants shipping services on ocean routes between the continental United States and Hawaii, Guam, or both, during the period between October 11, 1999, and May 31, 2008. Consolidated Complaint at ¶¶ 4–5 (docket no. 69). Defendant Matson Navigation Company, Inc. ("Matson") is a wholly-owned subsidiary of defendant Alexander & Baldwin, Inc. *Id.* at ¶ 33. Defendants Horizon Lines, LLC (formerly known as CSX Lines), Horizon Lines Holding Co., and Horizon Lines, Inc. (collectively, "Hori-

zon") are affiliated companies. *Id.* at ¶¶ 36–38.

■ Pursuant to the Merchant Marine Act of 1920 (the "Jones Act"), trade between domestic United States ports is limited to "ships built in American shipyards, owned by American citizens, and operated under the American flag." *OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 809–10 (D.C.Cir.1998); *see also* 46 U.S.C. §§ 12102, 12103, 12111, & 12112. This ocean trade has "significant legal and regulatory barriers to entry" and is *"not a contestable market." Matson Navigation Co. v. Fed. Maritime Comm'n*, 959 F.2d 1039, 1047 (D.C.Cir.1992) (emphasis in original) (observing that a contestable market is one in which entry is possible with little or no sunk investment, exit is relatively cost-free, and no legal or regulatory barriers to entry or exit exist). Plaintiffs allege that Matson and Horizon together control 96% of the trade between the west coast of the continental United States and Hawaii and 100% of the trade between the west coast and Guam. Consolidated Complaint at ¶ 56 (docket no. 69). According to plaintiffs, Matson's and Horizon's (or its predecessors') relative market shares, at least in the Hawaii trade, remained fairly stable during the years between 1995 (68% and 28%, respectively) and 2003 (67% and 29%, respectively). *Id.* at ¶ 63.

Matson and Horizon are members of the Maritime Cabotage Task Force ("MCTF"), as well as the Transportation Institute. *Id.* at ¶¶ 68 & 69. Matson and Horizon provide data on container sizes and quantities, as well as cargo quantities, weights, and volumes, to the Port Import Export Reporting Service ("PIERS"), but

---

1. Section 1 of the Sherman Act provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

no allegation has been made that PIERS is supplied with any pricing information. *Id.* at ¶ 71. Matson and Horizon are required to file their rates with the Surface Transportation Board, except as to statutorily exempted cargo or cargo carried under separate written agreements with specific shippers, in which both parties agree to waive their statutory rights. *See id.* at ¶ 80; *see also* 49 U.S.C. §§ 13702 & 14101(b). In the Consolidated Complaint, plaintiffs allege that defendants have colluded not to use extra-tariff written agreements with their customers; plaintiffs suggest that such agreements would be "confidential" and would inhibit defendants' ability to "mutually police each other's conduct." Consolidated Complaint at ¶ 80 (docket no. 69).

Beginning in October 1999, defendants began imposing fuel surcharges, which plaintiffs allege are calculated as a percentage of revenue. *Id.* at ¶¶ 83 & 86. These fuel surcharges have risen substantially from 1.75% at the outset to 33.75% just prior to the commencement of the first of these antitrust actions, although intermittent fluctuations downward have occurred. *See id.* at ¶ 83 (table showing overall climb in surcharges, but also small decreases in November 2001, May 2003, October 2006, November 2006, and January 2007). Plaintiffs allege that these fuel surcharges were effectuated in lockstep 29 different times during the period from 1999 to 2008. *Id.* Plaintiffs, however, provide no historical (*i.e.*, pre–1999) data concerning the relative timing of defendants' rate increases. Plaintiffs also contend that the increase in fuel surcharges over the period at issue far outpaced the rising cost of diesel or residual fuel oil ("RFO"), also known as bunker fuel, *id.* at ¶¶ 87 & 88, and that defendants' parallel pricing bears no correlation to their actual, disparate fuel costs, which vary by carrier depending on vessel types, routes, cargos, and fuel conservation efforts, *id.* at ¶ 86. Plaintiffs

therefore infer that these fuel surcharges were set pursuant to an agreement between defendants in violation of Section 1 of the Sherman Act.

Around the time fuel surcharges were first being introduced, Matson and Horizon altered their fleet schedules. Plaintiffs allege that, prior to 2000, Matson's sailings from Los Angeles to Hawaii were bi-weekly. *Id.* at ¶ 98. In 2000, Horizon began operating a vessel from Los Angeles during the opposite week. *Id.* Matson responded by employing a second ship that coincided with Horizon's bi-weekly service, resulting in Matson offering weekly availability. *Id.* Horizon then negotiated a favorable rate to haul its freight on Matson's vessels before removing its own ship from the Los Angeles to Hawaii route. *Id.* Plaintiffs allege that, in reaching their vessel capacity sharing agreement, Matson and Horizon also violated the antitrust laws.

### Discussion

In their joint motion to dismiss, defendants assert that the Consolidated Complaint fails to sufficiently allege an antitrust claim and that, even if such claim is adequately pleaded, it is precluded by the "filed rate doctrine." The Court will address these issues seriatim.

### A. *Pleading an Antitrust Claim*

At a minimum, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). With respect to an antitrust claim, the Supreme Court has provided substantial guidance concerning the quantum and nature of factual allegations required to satisfy Rule 8. *See Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In *Twombly,* the Supreme Court made clear that an antitrust complaint must contain "enough factual matter (tak-

en as true) to suggest that an agreement was made." *Id.* at 556, 127 S.Ct. 1955. The *Twombly* Court observed that § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade, but only those "effected by a contract, combination, or conspiracy." *Id.* at 553, 127 S.Ct. 1955. Thus, even "conscious parallelism" reflecting the "common reaction of 'firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions' is 'not in itself unlawful.'" *Id.* at 553–54, 127 S.Ct. 1955 (alterations in original) (quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)). As a result, a showing of parallel conduct, without more, "mirrors the ambiguity of the behavior" and is just as consistent with the existence of a conspiracy as it is "with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554, 127 S.Ct. 1955. For this reason, an allegation of parallel conduct and a bare assertion of conspiracy will not suffice.

█ Rather, to survive a Rule 12(b)(6) motion, an antitrust complaint must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556, 127 S.Ct. 1955. The complaint must offer "more than labels and conclusions" and contain more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555, 127 S.Ct. 1955. Moreover, it must indicate more than mere speculation of a right to relief. *Id.* In sum, on a Rule 12(b)(6) motion, the question for the Court is whether the facts in the complaint sufficiently state a "plausible" ground for relief. *Id.* at 556–57, 127 S.Ct. 1955.

Although courts should "be cautious before dismissing an antitrust complaint in advance of discovery," they must also remember that "proceeding to antitrust discovery can be expensive." *Id.* at 558, 127 S.Ct. 1955. The *Twombly* Court considered it "no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through 'careful case management.'" *Id.* at 559., 127 S.Ct. 1955 The Supreme Court ultimately concluded that "it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support a § 1 claim." *Id.* (quoting *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) (alteration therein)). Thus, when a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 558, 127 S.Ct. 1955.

█ In this case, in framing their antitrust claim, plaintiffs rely on the following categories of factual allegations: (i) information exchanges through trade associations and the like; (ii) evidence of antitrust behavior in a different ocean trade revealed by a Department of Justice ("DOJ") investigation; and (iii) parallel activities in a concentrated, incontestable market. Plaintiffs ask the Court to consider these claims as a whole, but to do so, the Court must first evaluate whether and to what extent each assertion contributes to the entire package. The Court will therefore examine the allegations individually before assessing their adequacy as a group.

### 1. *Bare Allegations Relating to Trade Associations*

In the wake of *Twombly,* courts have reached opposite results as to the viability of the antitrust complaints before them. A distinguishing factor between these cases

has been the inclusion of specific allegations concerning time, place, and person versus general allusions to "secret meetings," "communications," or "agreements." *See In re Less–Than–Truckload ("LTL") Shipping Servs. Antitrust Litig.*, 2009 WL 323219 at *10–*11 (N.D.Ga.) (contrasting *In re Oriented Strand Board ("OSB") Antitrust Litig.*, 2007 WL 2253419 (E.D.Pa.), and *In re Graphics Processing Units Antitrust Litig.*, 540 F.Supp.2d 1085 (N.D.Cal. 2007), in which specific dates and specific actions were pleaded, with *In re Air Cargo Shipping Antitrust Litig.*, E.D.N.Y. Case No. 06–md–1775, 2007 WL 2071703, and *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50–51 (2d Cir.2007), involving, respectively, vague allegations of "secret meetings" and conclusory accusations of "conspiratorial activity" constituting "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatsoever").

█ In this case, plaintiffs allege that Matson and Horizon belong to organizations via which they had an "opportunity" to meet. *See* Consolidated Complaint at ¶ 68 ("The MCTF provides opportunities for information sharing."); *see also id.* at ¶ 70 ("At MCTF and Transportation Institute meetings, as well as at other trade association meetings, the Defendants had opportunities to exchange information and to enter into agreements. . . ."). Attendance at industry trade shows and events, however, "is presumed legitimate and is not a basis from which to infer a conspiracy, without more." *In re Graphics Processing Units Antitrust Litig.*, 527 F.Supp.2d 1011, 1023 (N.D.Cal.2007) [hereinafter *In re GPU*] (citing *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999)).

In *In re GPU,* the Court found the complaint wanting despite the plaintiffs' attempt "to correlate the trade shows to the release of products at certain price points, implying that defendants must have met and made the decisions to do so." *Id.* The *In re GPU* Court concluded that the complaint was missing "any specific allegation that defendants' representatives actually met to fix prices." *Id.* Moreover, because the defendants were alleged to have attended up to nine of the same trade events in the same year, the Court concluded that it was "almost axiomatic that a product release would fall within a few months of one trade meeting or another, there having been so many of them," and that the plaintiffs' allegations were "just as consistent with coincidence as they [were] with conspiracy." *Id.*

In this case, plaintiffs offer no particulars concerning the locations or dates of any meetings, and although they name certain members of MCTF, they do not identify any individuals who might have been involved in any illicit communications. *See* Consolidated Complaint at ¶¶ 68–71 (docket no. 69). Moreover, plaintiffs make no attempt to compare the timing of trade association meetings and fuel surcharge increases. Thus, the complaint contains even less factual matter than what was deemed inadequate in *In re GPU,* and the Court does not view plaintiffs' general allegations of membership in trade organizations as adding anything to the mix. *Cf. In re Se. Milk Antitrust Litig.*, 555 F.Supp.2d 934, 942 (E.D.Term.2008) ("To allege an agreement between antitrust co-conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin." (quoting *Twombly,* 550 U.S. at 565 n. 10, 127 S.Ct. 1955)).

### 2. *Antitrust Behavior Limited to Puerto Rico Trade*

On April 17, 2008, the DOJ announced that it had begun an investigation into "the possibility of anticompetitive practices" in

the shipping trade between the continental United States and Puerto Rico. Consolidated Complaint at ¶ 72 (docket no. 69). On April 30, 2008, Alexander & Baldwin, Inc. publicly disclosed that it had received a grand jury subpoena for documents. *Id.* at ¶ 73. The following day, the first of these antitrust actions relating to the Hawaii and Guam trade was filed. *See, Alpha Freight & Transp. Int'l. Inc. v. Horizon Lines, Inc., et al.,* Case No. C08–1455Z (originally filed in the Middle District of Florida on May 1, 2008). Two more cases were filed nine days later, *see Steinberg, et al. v. Matson Navigation Co., et al.,* Case No. C08–1231Z (originally filed in the Northern District of California on May 9, 2008); *Taste of Nature Inc. v. Matson Navigation Co., et al.,* Case No. C08–1235Z (originally filed in the Central District of California on May 9, 2008), and all but one of these related suits were commenced by early September 2008. On October 1, 2008, four individuals pleaded guilty to antitrust charges relating to the Puerto Rico trade. Consolidated Complaint at ¶ 75 (docket no. 69).

Plaintiffs focus much attention on these pleas, three of which were entered by Horizon executives. *Id.* Plaintiffs, however, allege that only one of these individuals had any involvement with Horizon's Hawaii or Guam routes, and they do not allege that this person's charges or guilty plea implicated the Hawaii or Guam trade in any way. *See id.* Moreover, although plaintiffs quote press reports relaying the DOJ's belief that more indictments will follow, *id.* at ¶¶ 76–77, they provide no link between the Puerto Rico and Hawaii or Guam markets. Indeed, Matson is not alleged to be involved in the water trade

between Puerto Rico and the United States mainland, and any anticompetitive agreements Horizon's executives made concerning shipping to and/or from Puerto Rico would necessarily have been with entities other than Matson.

Similar attempts at cross-fertilization have been rejected by other courts, and the Court finds plaintiffs' invocation of the DOJ investigation equally unavailing.[2] *See, e.g., In re Elevator,* 502 F.3d at 52 ("Allegations of anticompetitive wrongdoing in Europe ... is merely to suggest (in defendants' words) that 'if it happened there, it could have happened here.' ... Without an adequate allegation of facts linking transactions in Europe to transactions and effects here, plaintiffs' conclusory allegations do not 'nudge[ their] claims across the line from conceivable to plausible.' " (insertion in original, quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955)). The cases on which plaintiffs primarily rely do not support a different view because those cases involved defendants with overlapping involvement in different markets, a factual scenario that plaintiffs in this case have not pleaded. *See In re Flash Memory Antitrust Litig.,* 643 F.Supp.2d 1133, 1148–49 (N.D.Cal.2009) (observing that employees of two antitrust defendants, which controlled the majority of the flash memory market, had responsibility for both flash memory and dynamic random access memory ("DRAM") pricing, and concluding that the employees' guilty pleas concerning price fixing as to DRAM gave rise to a reasonable inference that they engaged in similar activities relating to flash memory); *In re Static Random Access Memory ("SRAM") Antitrust Litig.,* 580 F.Supp.2d 896, 903 (N.D.Cal.2008)

**2.** As indicated in a case cited by plaintiffs, "[a] plaintiff may surely rely on governmental investigations, but must also, under FRCP 11, undertake his own reasonable inquiry and frame his complaint with allegations of his own design." *In re Tableware Antitrust Litig.,* 363 F.Supp.2d 1203, 1205 (N.D.Cal.2005). "Simply saying 'me too' after a governmental investigation does not state a claim." *Id.*

(ruling that, because "the same actors associated with certain Defendants were responsible for marketing both SRAM and DRAM," the DRAM guilty pleas supported an inference of a conspiracy in the SRAM industry, but also holding that the DOJ investigation regarding SRAM did not itself support the plaintiffs' SRAM antitrust claims).

### 3. Nothing Beyond Parallel Activity

In light of *Twombly*'s admonition that parallel conduct alone does not establish a plausible antitrust claim, *Twombly*'s progeny have identified certain types of factual allegations that might save a complaint from dismissal pursuant to Rule 12(b)(6), including direct evidence of an agreement or communications between antitrust defendants[3] and descriptions of historical pricing practices suggesting a lack of precedent and no discernible reason for change other than conspiracy.[4] Unlike in cases in which antitrust complaints have been deemed sufficient, plaintiffs here do not identify any specific communications or contracts.[5] Moreover, plaintiffs supply no

**3.** *See William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 561 F.3d 1004, 1010 (9th Cir. 2009) (reversing Rule 12(b)(6) dismissal and holding that actual contracts defendants separately executed could be considered in the aggregate in assessing antitrust liability, reasoning that "a defendant who restrains trade by an obvious pattern and practice of entering into individual contracts should not be allowed to do piecemeal what he would be prohibited from doing all at once"); *In re SRAM*, 580 F.Supp.2d at 901–02 (denying motion to dismiss antitrust claims, observing that "Plaintiffs include in their complaints a number of specific allegations of communications," "Plaintiffs cite various emails in which individual Defendants consider information obtained from other Defendants," and "Plaintiffs have further supported those allegations with evidence of communications between Defendant companies," including "a 1998 email chain between Hitachi and Samsung"); *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225 at \*12 (D.N.J.2007) (denying 12(b)(6) motion, finding that "the instant Complaint sets forth allegations of specific anti-competitive agreements"); *see also In re Flash Memory*, 643 F.Supp.2d at 1143–44 (denying motion to dismiss direct purchasers' complaint, which alleged *inter alia* that "Samsung's Vice President of Marketing sent an internal email to the various heads of the company's regional memory sales groups" instructing the recipients "to contact their *competitors* to urge them that they '*must not retreat from the last quoted price*'" and that Samsung had made announcements to industry analysts concerning "severe shortages" in overall inventories, which would "bolster its margins," but about which it would have no

knowledge absent communications with its competitors (emphasis in original)).

**4.** *See In re Flat Glass Antitrust Litig.*, 2009 WL 331361 (W.D.Pa.) (denying Rule 12(b)(6) motion in the face of allegations that (i) historically, the defendant construction glass manufacturers had been unable to raise and maintain prices and they had varied their surcharges by region of the country, (ii) during the period of the supposed conspiracy, the manufacturers' prices increased by "identical percentages" and their surcharges did not differ by region, and (iii) the parallel conduct ceased after similar antitrust behavior was thwarted in Europe); *In re Thin Film Transitor Liquid Crystal Display (TFT-LCD/Flat Panel) Antitrust Litig.*, 586 F.Supp.2d 1109, 1115–16 (N.D.Cal.2008) (denying motion to dismiss direct purchasers' complaint, concluding that "[t]he complaint alleges complex and unusual pricing practices by defendants, which cannot be explained by the forces of supply and demand" in that, prior to the conspiracy, "the industry faced declining TFT–LCD panel prices" due to "advances in technology and improving efficiencies," as well as new companies entering the market, but beginning in 1996, the TFT–LCD product market was "'characterized by unnatural and sustained price stability, as well as certain periods of substantial increases in prices' [and] a compression of price ranges ..., which is inconsistent with natural market forces").

**5.** The only allegation of a contractual relationship between Matson and Horizon involves vessel capacity sharing on the Los Angeles to Hawaii route. *See* Consolidated

data concerning pricing practices predating the alleged anticompetitive agreement, and they fail to link the lockstep fuel surcharge fluctuations [6] to anything other than the type of parallel conduct generally present in a homogeneous market. *See In re LTL Shipping*, 2009 WL 323219 at \*18 ("In a homogeneous industry each major player has the same incentive to charge the same surcharge and realize the same improved profit margin."): *see also Matson*, 959 F.2d at 1045 (affirming the Federal Maritime Commission's conclusion that, "instead of engaging in fierce price competition with Matson, Sea–Land [Horizon's predecessor] was more likely to follow Matson's price leadership and compete primarily on the basis of service"); *cf. DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080, 1092 (9th Cir.2007) ("All businesses … monitor their competitors' pricing to see whether and how they should match or beat the discounts they are offering. Moreover, price watching is inherent in a tariff system that statutorily requires carriers to publish their common carrier rates.").

### 4. *Viewing the Factual Allegations as a Whole*

In this case, the whole is not more than the sum of the parts. Even when combined, the pieces plaintiffs have supplied offer little support for their assertion of an antitrust agreement. Of the numerous post-*Twombly* cases, *In re LTL Shipping* is the most analogous to the action currently before the Court. Like the instant case, *In re LTL Shipping* involved parallel increases in fuel surcharges, which the plaintiffs asserted were the product of an antitrust conspiracy. As in this case, the plaintiffs in *In re LTL Shipping* did not plead direct evidence of an agreement to fix prices, such as, for example, "allegations of a particular communication between the Defendants." 2009 WL 323219 at \*12. Instead, in *In re LTL Shipping*, the plaintiffs "at most allege[d] parallel pricing conduct, the sharing of surcharge price information publicly using websites, and the claim that opportunities arose at which the Defendants could have met and hatched a price-fixing conspiracy." *Id.* at \*13. Although the plaintiffs in *In re LTL*

Complaint at ¶ 98 (docket no. 69). This type of arrangement, however, appears consistent with the water freight industry. *See, e.g., DHX, Inc. v. Surface Transp. Bd.*, 501 F.3d 1080, 1083 (9th Cir.2007). In *DHX, Inc.*, the Ninth Circuit explained that, although "some shipments via water carrier are arranged between the carrier and the shipper directly, others are handled through a third-party intermediary such as a freight forwarder." *Id.* A freight forwarder "assembl[es] and consolidat[es] shipments to take advantage of volume rates offered by the carrier actually hauling the goods," and it maintains the dual status of both carrier and shipper. *Id.* Freight forwarders earn a profit by charging rates lower than a water carrier's price for small shipments, but higher than the amount paid to the water carrier for the consolidated load. *Id.* Absent some direct evidence of an anticompetitive agreement, the Consolidated Complaint establishes nothing more than the customer-as-well-as-competitor relationship common in the water trade.

6. Defendants complain that plaintiffs, in comparing a 333% and 396% increase in diesel and RFO prices, respectively, to a 1,929% increase in fuel surcharges over the same period, have performed "fuzzy math." *See* Reply at 7 n. 7 (docket no. 97); *see also* Consolidated Complaint at ¶ 88 (docket no. 69). Although the Court accepts as true, as it must for purposes of defendants' Rule 12(b)(6) motion, the percentage increases stated in the Consolidated Complaint, the Court is not required to and does not adopt plaintiffs' theory that the disparities in the percentages of change reflect a lack of correlation between fuel prices and fuel surcharges. Fuel prices and fuel surcharges involve different units of measurement and orders of magnitude, making a straight, uncalibrated comparison of their percentage increases inappropriate.

*Shipping* described organizations to which the defendants belonged, they included "no allegation that the Defendants attended the meetings, or that the Defendants had any other communications through which they might have established an agreement." *Id.* at *14. The same dearth of factual matter is evident in the Consolidated Complaint now at issue.

As in the pending case, in *In re LTL Shipping,* the fuel surcharges were imposed by freight carriers, but in *In re LTL Shipping,* the transportation was provided by truck, as opposed to marine vessel. *Id.* at *1–*2. The defendants in *In re LTL Shipping* were engaged in the less-than-truckload ("LTL") market, which is similar to the noncontiguous domestic ocean trade in that it is concentrated and incontestable, with only a few companies competing for business, and with new entities facing substantial barriers to entry.[7] *Id.* A typical LTL operation collects small (less than truckload) shipments from specific locations, aggregates them for movement by truck between terminals, and then separates them at the destination for local delivery. *Id.* at *2. Similar to noncontiguous domestic shipping, LTL services are "effectively fungible and interchangeable between carriers," with customers distinguishing "between LTL service providers primarily on the basis of price." *Id.*

In *In re LTL Services,* the Court concluded that the plaintiffs' allegations established simply "a factual context suggesting 'parallel conduct that could just as well be independent action.'" *Id.* at *15 (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955). Given the homogeneous nature of the LTL market, with "all players ... operating from essentially the same information at the same time charging the same rates,"

and with "[a]ll carriers ... equally impacted by market variables, such as fuel costs, labor costs, taxes, and unanticipated costs such as natural disasters and weather delays," the Court found "plausible that the Defendants' assessment of fuel surcharges was directly the result of increased price of diesel fuel, not an anticompetitive conspiracy." *Id.* at *15–*16. The Court further concluded that, even assuming the defendants in *In re LTL Services* used the Internet and trade association meetings to discuss anticompetitive agreements, the time period alleged, spanning four years from 2003 to 2007, was "too broad for the Court to infer an agreement." *Id.* at *17. In the final analysis, "Plaintiffs' allegations [did] not show enough facts for the Court to find that agreement was plausible. What the allegations show[ed] instead [was] that all LTL service providers had the same incentives to charge the same shipping rates, and that over time they eventually each did so.... Plaintiffs must show that an agreement is the plausible reason for pricing decisions, not an unintentional but common set of individual reactions to external stimuli. Plaintiffs have not made this showing." *Id.* at *18.

Given the equally deficient pleadings and the similarities in the underlying facts, particularly the characteristics of the markets at issue and the protracted durations of the alleged anticompetitive activities, this Court reaches the same conclusions in this case as the Court did in *In re LTL Shipping.* The Court holds that the Consolidated Complaint pleads nothing more than "parallel conduct and a bare assertion of conspiracy," which *Twombly* teaches is insufficient to survive a Rule 12(b)(6) motion to dismiss. 550 U.S. at 556–57, 127

---

7. Unlike noncontiguous domestic carriers, however, LTL service providers are not subject to tariff filing requirements, the industry having been deregulated for more than a dec-

ade. 2009 WL 323219 at *3 (citing the Motor Carrier Act enacted in 1980, the 1994 Trucking Industry Regulatory Reform Act, and the ICC Termination Act of 1995).

S.Ct. 1955. Because the Court must also consider whether to grant plaintiffs leave to amend, *see, e.g., Lopez v. Smith,* 203 F.3d 1122, 1130 (9th Cir.2000), the Court must now turn to defendants' argument that the "filed rate" doctrine precludes any antitrust claim, regardless of how well-pled it might be.

### B. *The Filed Rate Doctrine*

■ The filed rate doctrine precludes monetary relief for antitrust and similar claims relating to tariffs or schedules filed with a federal regulatory agency. *See Keogh v. Chicago & N.W. Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). In *Keogh,* pursuant to the federal antitrust laws, the plaintiff sued eight railroad companies, whose officers and agents participated in a committee, the function of which was to "secure agreement in respect to freight rates." *Id.* at 159–60, 43 S.Ct. 47. The Supreme Court observed that, to the extent any illegal price fixing occurred, it could be redressed in criminal proceedings or by way of injunction, but the plaintiff, a private shipper, could not obtain a rebate on the theory that, but for the conspiracy, he would have enjoyed lower rates. *Id.* at 161–62, 43 S.Ct. 47.

The *Keogh* Court articulated four separate reasons for its decision. First, the plaintiff could not establish the requisite injury "in his business or property" under the antitrust laws because the carrier was required to charge and the plaintiff was required to pay the filed rate. *See id.* at 163, 43 S.Ct. 47 (reasoning that "[i]njury implies violation of a legal right," the "legal rights of shipper as against carrier in respect to a rate are measured by the published tariff," and the "rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier"). Second, Congress delegated to the Interstate Commerce Commission ("ICC") the authority to determine whether a particular rate is legal, and the plain-

tiff's claim essentially sought a remedy contrary to a decision of the ICC. *See id.* at 161–62, 43 S.Ct. 47. Third, in light of the law prohibiting discrimination by carriers, the plaintiff could not be awarded monetary damages because they would "operate to give him a preference over his trade competitors." *Id.* at 163, 43 S.Ct. 47; *see also id.* ("It is no answer to say that each of these [shippers] might bring a similar [antitrust] action.... Uniform treatment would not result, even if all sued, unless the highly improbable happened, and the several juries and courts gave to each the same measure of relief."). Finally, the plaintiff's alleged damages "rest[ed] on hypothesis," requiring speculation as to what rate might have been in effect but for the allegedly collusive activities of the carriers, and relying on a flawed assumption that a lower rate would have inured to the plaintiff's, as opposed to his customers' or the ultimate consumer's, benefit. *See id.* at 164–65, 43 S.Ct. 47.

Although the filed rate doctrine has been "the target of criticism since its inception," *County of Stanislaus v. Pac. Gas & Elec. Co.,* 114 F.3d 858, 862 (9th Cir. 1997), it has never been overruled. Over sixty years after *Keogh,* the Supreme Court confirmed the vitality of the filed rate doctrine, concluding that certain legislative activity relating to common carrier rates "left *Keogh* undisturbed," lending "powerful support to *Keogh*'s continued viability." *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 419, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). In *Square D,* certain shipping companies sued a tariff bureau and a number of its motor carrier members, alleging a conspiracy "to fix, raise and maintain prices and to inhibit or eliminate competition for the transportation of freight by motor carrier between the United States and the Province of Ontario, Canada." *Id.* at 411–12, 106 S.Ct. 1922. Pursuant to *Keogh,* on a motion

brought under Rules 12(c) and 12(h)(2), the trial court dismissed the shippers' complaint, and the Second Circuit affirmed as to their claims for monetary damages. *Id.* at 414, 106 S.Ct. 1922.

Observing that "the *Keogh* rule has been an established guidepost at the intersection of the antitrust and interstate commerce statutory regimes for some 6½ decades," the Supreme Court refused the shippers' invitation to overrule *Keogh,* indicating that such decision "must come from Congress," and not from the courts. *Id.* at 423–24, 106 S.Ct. 1922. The *Square D* Court rejected the shippers' contention that *Keogh* had been implicitly overruled by the Reed–Bulwinkle Act, 62 Stat. 472 (1948), which allowed the ICC to authorize the establishment of tariff bureaus and insulated from antitrust liability any common carrier that participated in an approved collective rate setting bureau. *Id.* at 413–14, 417–18, 106 S.Ct. 1922. The shippers argued that *Keogh* created an immunity from the antitrust laws, that the Reed–Bulwinkle Act delineated an immunity only for specific ratemaking activities, and that the broader immunity articulated in *Keogh* had therefore been repudiated. *Id.* at 418, 106 S.Ct. 1922. After examining the history of the Reed–Bulwinkle Act, the Supreme Court instead concluded that the law was enacted in response to *Georgia v. Pa. R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), a case distinguishing *Keogh* and holding that injunctive relief against the joint establishment of rates was available. *Square D,* 476 U.S. at 418–19, 106 S.Ct. 1922. Congress had answered by creating "an absolute immunity from the antitrust laws for approved collective ratemaking activities." *Id.* at 419, 106 S.Ct. 1922. In doing so, Congress indicated no intent "to change or supplant the *Keogh* rule," but rather expressly stated that "the bill left the antitrust laws applicable to carriers unchanged 'so far as they are now applicable.'" *Id.* (quoting

H.R.Rep. No. 80–1100, at 5 (1947), *reprinted in* 1948 U.S.C.C.A.N. 1844, 1848).

More recently, the Ninth Circuit has recognized the applicability of the filed rate doctrine to regulated volumes, as opposed to just "rates." *County of Stanislaus,* 114 F.3d at 864 (the doctrine "is not limited to 'rates' *per se*" (quoting *Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 966, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986))). In *County of Stanislaus,* the Ninth Circuit affirmed the trial court's dismissal, pursuant to Rule 12(b)(6) and the filed rate doctrine, of the plaintiffs' market preclusion claim, which alleged that the defendants' import practices detrimentally affected the plaintiffs' ability to obtain less expensive natural gas. 114 F.3d at 862–66. The Ninth Circuit reasoned that the quantity of natural gas imported by the defendants had been authorized by the Economic Regulatory Administration ("ERA"), one of two federal agencies that regulate the natural gas industry, thereby establishing the "import volume as conclusively reasonable" and "foreclos[ing] any challenge to importation volumes." *Id.* at 860–61, 864. Moreover, the Ninth Circuit observed that the plaintiffs' claim for damages "would require us to engage in the speculation that *Keogh* and its progeny forbid." *Id.* at 865.

The Ninth Circuit has also held that an antitrust claim can be within *Keogh*'s preclusive ambit even when the rates at issue are not actually "filed" with a governing agency. *E. & J. Gallo Winery v. Encana Corp.,* 503 F.3d 1027 (9th Cir.2007). In *Gallo,* the Ninth Circuit affirmed the denial of the defendant's summary judgment motion, but it concluded that many of the plaintiff's antitrust claims were barred by the filed rate doctrine. *Id.* at 1030, 1048–49. In *Gallo,* the plaintiff was a wine producer, which sued its natural gas supplier for state and federal antitrust law

violations. *Id.* at 1030. Historically, the natural gas market had consisted of three segments: (i) producers, which procured natural gas at their wellheads; (ii) interstate pipelines, which purchased natural gas from producers and then transported it to various locations; and (iii) local distributors, who bought natural gas from interstate pipelines and sold it to consumers. *Id.* at 1036. During the Depression Era, Congress sought to curb the market power of interstate pipelines and granted to the Federal Energy Regulatory Commission ("FERC") jurisdiction over wholesale rates charged by producers at their wellheads and by interstate pipelines. *Id.* (citing Natural Gas Act, 52 Stat. 821 (1938)). By the late 1970s, however, the country was experiencing natural gas shortages and, as a result, Congress began deregulating the industry, culminating in the elimination of FERC's authority to set prices at wellheads, where "first sales" generally occurred. *Id.* at 1036–37 (citing Natural Gas Wellhead Decontrol Act of 1989, Pub.L. No. 101–60, and explaining that "first sales" are those not preceded by a sale to an interstate or intrastate pipeline, distribution company, or retail customer).

To further Congress's intent and provide consumers with better access to the newly deregulated and more competitive wellhead markets, FERC required interstate pipelines to "unbundle" transportation from product sales and to offer common carrier services to those who purchased natural gas from another source and wished to ship it in a pipeline. *Id.* at 1038 (citing Order 636, 57 Fed.Reg. 13,267 (Apr. 16, 1992)). FERC also began issuing "blanket sale" certificates to interstate pipelines, allowing them to sell unbundled natural gas at market-based rates rather than at the rates filed with FERC. *Id.* During the period at issue in *Gallo*, market rates for natural gas were "pegged" to indices

published in *Natural Gas Intelligence* and *Gas Daily*. *Id.* at 1031. These indices incorporated voluntarily submitted data concerning natural gas trading activity. *Id.* After an investigation completed in 2003, FERC concluded that the information being used to generate the natural gas indices "was reported in a less than meticulous manner," that the natural gas indices were "ripe for manipulation," and that market participants had actually engaged in misconduct, including providing "false reports of natural gas prices and trade volumes." *Id.* at 1032 (citing FERC's Final Report on Price Manipulation in Western Markets (2003)).

In *Gallo*, the plaintiff wine producer alleged it was injured by these illegal practices, which had artificially inflated the indices and thereby increased the rates the plaintiff had paid for natural gas. *Id.* The Ninth Circuit, however, concluded that the filed rate doctrine precluded many of the plaintiff's claims. The Ninth Circuit rejected the plaintiff's contention that only rates literally filed with and approved by FERC could render the *Keogh* doctrine applicable. *Id.* at 1039–43. The *Gallo* Court did not view FERC's decision to replace filed rates with market rates as an abdication of its responsibilities; rather, FERC was found to have continued in its efforts to regulate the natural gas industry, "albeit with a light hand," engaging in market oversight and taking corrective action upon the discovery of market manipulation. *Id.* at 1041–42.

Given the purposes of the filed rate doctrine, which include preserving the exclusive jurisdiction granted by Congress to a regulatory agency, the *Gallo* Court held that any claims relating to rates, whether filed with FERC or market based, for natural gas transactions under FERC's jurisdiction were preempted under *Keogh.*

*Id.* at 1041–43. Moreover, although FERC's jurisdiction did not extend beyond wholesale transactions, the Ninth Circuit ruled that the filed rate doctrine applied with equal preclusive effect to claims involving retail purchases of natural gas because such claims essentially challenged the upstream market-based rates within FERC's purview. *Id.* at 1043–45. To have held otherwise would have created an improper "cost trap," disabling retailers from recovering their wholesale costs. *See id.* at 1043–44 (analogizing a retail customer's antitrust claim to state regulations setting retail utility rates, which have been struck down as cost traps preempted by federal law). Having narrowed the permissible scope of the plaintiff's claims, the *Gallo* Court remanded the matter, indicating that "the district court may consider [the plaintiff's] claims to the extent they are based on rates that are not FERC-authorized rates." *Id.* at 1049. The Ninth Circuit explained that "[m]isreported rates and rates reported for fictitious transactions are not FERC-approved rates," and it observed that the indices at issue potentially included "transactions outside FERC's jurisdiction," *i.e.*, wellhead and retail sales. *Id.* at 1045.

### 1. *Gallo Does Not Establish "All or Nothing" Standard*

Plaintiffs assert the Ninth Circuit's *Gallo* decision stands for the proposition that the pending Rule 12(b)(6) motion must be denied unless it "defeat[s] the entirety of the plaintiffs' claims." Response at 16 (docket no. 94). Plaintiffs' contention lacks merit. In *Gallo*, the Ninth Circuit made clear that certain of the wine producer's claims were not allowed in light of the filed rate doctrine and that those claims should not proceed forward on remand. Moreover, although the *Gallo* opinion provides substantial guidance concerning the contours of the filed rate doctrine, the ultimate result in *Gallo*, namely affirming

the district court's denial of summary judgment in light of triable issues, does not translate into a standard applicable to the motion to dismiss pending before this Court. *See Fleming v. Lind–Waldock & Co.*, 922 F.2d 20, 23 (1st Cir.1990) (Rule 12(b)(6) and Rule 56 motions "place different burdens on the parties at different times in the course of litigation"). Thus, rather than restricting this Court's ability to grant a Rule 12(b)(6) motion unless "*all* of the challenged conduct [is] subject to the filed rate doctrine," Response at 16 (docket no. 94) (emphasis is original), the Court concludes that the *Gallo* decision authorizes it to narrow and focus the claims at issue in light of the viable defenses.

### 2. *The Consolidated Complaint Implicates the Filed Rate Doctrine*

██ In the Consolidated Complaint, plaintiffs have artfully avoided directly alleging that the noncontiguous domestic water trade is regulated in a manner rendering the filed rate doctrine applicable. Plaintiffs have pleaded merely that "certain aspects of the Pacific Ocean shipping industry may be governed by tariffs." Consolidated Complaint at ¶ 80 (docket no. 69). Plaintiffs, however, in this same paragraph of the Consolidated Complaint, explicitly acknowledge, as they must, the applicability of the ICC Termination Act of 1995 ("ICCTA"), Pub.L. No. 104–88, 109 Stat. 803 (1995). Thus, plaintiffs cannot through artful pleading circumvent the filed rate doctrine.

Pursuant to the ICCTA, tariffs must be filed with the Surface Transportation Board ("STB") in connection with the movement of household goods or with transportation or service in noncontiguous domestic trade. 49 U.S.C. § 13702(a). A carrier "may not charge or receive a different compensation for the transportation

or service than the rate specified in the tariff." *Id.* Moreover, the STB has jurisdiction over any claim that a filed tariff or "related rule or practice" is unreasonable.[8] 49 U.S.C. § 13702(b)(6) (complaints concerning "a rate or related rule or practice ... may be submitted to the Board for resolution"); *see also* 49 U.S.C. § 13701(a) (a "rate, classification, rule, or practice related to transportation or service" by a "water carrier in noncontiguous domestic trade" must be "reasonable").

The only two exceptions to the requirement that a rate be filed with the STB are (i) if the items being shipped in noncontiguous domestic trade constitute bulk cargo, forest products, recycled metal scrap, waste paper, or paper waste, 49 U.S.C. § 13702(a)(1), and (ii) if the carrier and the shipper have entered into a contract concerning "specified services under specified rates and conditions" for cargo other than household goods, and they have expressly waived in writing "any or all rights and remedies under this part," meaning Part B of Subtitle IV of Title 49 of the United States Code, 49 U.S.C. § 14101(b). The rights included within Part B include the ability to challenge "a rate or related rule or practice" as unreasonable. *See* 49 U.S.C. §§ 13701 & 13702 (both within Part B of Subtitle IV of Title 49). The exclu-

sive remedy for an alleged breach of a contract executed pursuant to § 14101(b) is an action in an appropriate state or federal court, unless the parties otherwise agree. 49 U.S.C. § 14101(b)(2).

 In asserting that their claims are not precluded by *Keogh* and its progeny, plaintiffs contend that defendants have not proven they properly filed their rates and that defendants have not shown the cargo at issue was subject to rate regulations. With regard to plaintiffs' first argument, the Court notes that nowhere in the Consolidated Complaint have plaintiffs alleged that defendants failed to maintain valid tariffs for any period of time.[9] Plaintiffs merely argue that an improperly filed rate cannot be used to assert the *Keogh* doctrine as a defense, citing *Sec. Servs., Inc. v. K Mart Corp.*, 511 U.S. 431, 114 S.Ct. 1702, 128 L.Ed.2d 433 (1994). The *K Mart* case does not support plaintiffs' broad assertion; rather, in *K Mart*, the Supreme Court specifically observed that "neither procedural irregularity nor unreasonableness nullifies a filed rate." *Id.* at 442, 114 S.Ct. 1702. In *K Mart*, the tariff at issue was considered void not due "to some blemish independently remediable," but because it was so incomplete as to render "a reliable calculation of charges" impossi-

---

8. By statute, port-to-port rates or divisions for noncontiguous domestic trade water carriers are presumed reasonable "if the aggregate of increases and decreases in any such rate or division is not more than 7.5 percent above, or more than 10 percent below, the rate or division in effect 1 year before the effective date of the proposed rate or division." 49 U.S.C. § 13701(d)(1); *see also* 49 U.S.C. § 13701(d)(2) (the percentages stated in § 13701(d)(1) must be annually adjusted in accordance with the Producers Price Index).

9. Defendants suggest that the Court may take judicial notice of their publicly filed tariffs without converting their Rule 12(b)(6) motion into a summary judgment motion. *See* Reply at 11 n. 10 (docket no. 97); *see also* Fed.

R.Civ.P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.")Defendants, however, have provided no documents or citations (for example, to an STB publication or website) based on which the Court could take such judicial notice, and the Court declines to do so. *See* Fed.R.Evid. 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

ble. *Id.* at 443, 114 S.Ct. 1702. In the Consolidated Complaint, plaintiffs have not given notice of what, if any, deficiencies exist in defendants' tariffs, and the Court cannot assess whether the rates at issue would be effective despite any irregularities or absolutely void due to the type of catastrophic flaw that prevented the bankrupt motor carrier in *K Mart* from relying on its tariff to recover previous undercharges.

As to plaintiffs' second contention concerning exempt cargo, plaintiffs have identified four companies with "wood" or "tree" in their names that have joined in this antitrust action. *See* Consolidated Complaint at ¶¶ 24, 26, 28, 30 (docket no. 69) (naming as plaintiffs "Winkler Woods, LLC," "50th State Distributors, Inc., d/b/a Santa's Christmas Trees," "Honolulu Hardwoods, Inc," and "Jeanne Thomas, d/b/a Mr. Christmas Tree"). Plaintiffs have not, however, indicated what cargo was shipped by any of these companies; rather, they imply that the cargo was trees and wood. *See* Response at 21 (docket no. 94). Whether such trees or wood would qualify as "forest products" or be otherwise excluded from tariffs was not pleaded or briefed and remains unclear. *See* 46 U.S.C. § 40102(10) ("The term 'forest products' includes lumber *in bundles*, rough timber, ties, poles, piling, laminated beams, bundled siding, bundled plywood, *bundled* core stock or veneers, bundled particle or fiber boards, bundled hardwood, wood pulp in rolls, wood pulp in unitized bales, and paper and paper board in rolls or in pallet or skid-sized sheets." (emphasis added)).

In their response to defendants' motion to dismiss, plaintiffs have attempted to place the burden on defendants to prove the negative of allegations plaintiffs did not plead in their Consolidated Complaint. Plaintiffs cite no authority for doing so, and the Court declines to impose such burden. The question before the Court is whether the Consolidated Complaint states a claim for which relief may be granted. Fed.R.Civ.P. 12(b)(6). The Court may not consider matters outside the pleadings and must decide, on the face of the Consolidated Complaint, whether the filed rate doctrine applies. In the absence of any pleaded facts indicating that the rates at issue are somehow void or that the cargo at issue was outside the scope of the STB's jurisdiction, no basis exists for concluding that *Keogh* does not control.

### 3. *The ICCTA Did Not Repeal Keogh*

█ In an effort to avoid the preclusive effect of *Keogh*, plaintiffs contend that, in passing the ICCTA, Congress nullified the filed rate doctrine with respect to water carriers. Plaintiffs provide no authority for support and offer no discussion of the legislative history of the ICCTA. In contrast, defendants cite to *Ocean Logistics Mgmt., Inc. v. NPR, Inc.,* 38 F.Supp.2d 77 (D.P.R.1999), in which the Court rejected similar challenges to the application of the *Keogh* doctrine. In response, plaintiffs complain that defendants "cite a single case," which has "been cited in only one other reported decision ... by the same Judge ... for an unrelated proposition." Response at 19 & n. 7 (docket no. 94). Plaintiffs, however, offer no contrary decision and no persuasive reason for disregarding the opinion in *Ocean Logistics.*

As noted in *Ocean Logistics,* until the enactment of the ICCTA, two different federal agencies regulated the noncontiguous domestic ocean trade, namely the Federal Maritime Commission ("FMC"), which had jurisdiction over port-to-port traffic, and the ICC, which regulated "joint through" rail/water intermodal traffic. 38 F.Supp.2d at 81. The ICCTA abolished the ICC, created the STB, and granted to the STB the jurisdiction previously exer-

cised by both the ICC and the FMC. Although the ICCTA partially deregulated the water trade by allowing carriers and shippers to form extra-tariff agreements as to freight other than household goods, *see* 49 U.S.C. § 14101(b)(1), the ICCTA continued the requirement that ocean shipping rates be otherwise filed with a federal agency, except with regard to certain types of cargo, *see* 49 U.S.C. '§ 13702(a). Thus, the ICCTA does not evidence any Congressional intent to fully extinguish the preemptive effect of the filed rate doctrine as to the noncontiguous domestic ocean trade. *See Ocean Logistics,* 38 F.Supp.2d at 87, 90–91 (holding that the carrier and shipper, in entering into a time volume agreement, did not contract pursuant to § 14101(b) and had not opted out of tariff filing requirements, that the rates at issue "remained subject to the full scope of the regulatory system devised by Congress," and that the shipper's claims against the carrier were barred by the filed rate doctrine).

Plaintiffs attempt to discount *Ocean Logistics* as involving a shipper who was not seeking a lower rate for itself but instead was trying to prevent other shippers from obtaining the same reduced rate that it enjoyed. Plaintiffs identify a distinction without a difference. Regardless of whether a shipper wants to decrease its rates or increase those of its competition, the shipper seeks the same result, namely an edge over other shippers. The goal of the shipper, however, has no relevance in analyzing the continued viability of the filed rate doctrine in light of the ICCTA.

Rather, as to that issue, the answer depends on whether the rates involved were filed, or required to be filed, with the STB or were memorialized in an unpublished contract.

Plaintiffs do not appear to contend that defendants are required by § 14101(b) to negotiate unregulated shipping agreements or that the parties to any shipping contract must waive the rights or remedies enumerated in Part B of Subtitle IV of Title 49. More importantly, plaintiffs do not, in the Consolidated Complaint, allege that any of them entered into any contract with any defendant pursuant to § 14101(b). To the contrary, plaintiffs contend that defendants conspired not to use such agreements with their customers. Consolidated Complaint ¶¶ 16 & 80 (docket no. 69). Thus, just as in *Ocean Logistics,* the claims here do not implicate the deregulatory provisions enacted by the ICCTA, and this case falls squarely within the ambit of *Keogh* and its progeny.

### 4. *Plaintiffs' Other Claims Implicate Rates*

■■■ In an attempt to salvage a portion of their Consolidated Complaint, plaintiffs argue that *Keogh* does not reach their claims that defendants engaged in anticompetitive conduct other than "price fixing." Plaintiffs focus on two allegedly "non-rate" activities, namely that defendants share vessel capacity, shipping each other's containers at lower rates than those charged to customers, and that defendants have refused, except in one instance,[10] to forego filed tariffs and form

---

**10.** Plaintiffs contend that Matson negotiated § 14101(b) agreements with General Motors Corp. ("GM") and Ford Motor Co. ("Ford"), ostensibly in an effort to compete with Pasha Hawaii Transport Lines LLC ("Pasha"), which had, in 2005, secured a similar arrangement with Chrysler Group LLC. Consolidated Complaint at ¶ 100 (docket no. 69). Plaintiffs also assert that Matson chartered a

particular vessel, the S.S. Great Land, to prevent Pasha from obtaining it and being in a position to offer weekly service. *Id.* These allegations do not implicate any entity other than Matson and therefore, standing alone, they do not plausibly identify an unlawful restraint of trade "effected by a contract, combination, or conspiracy." *See Twombly,* 550 U.S. at 553, 556–57, 127 S.Ct. 1955.

separate agreements with individual shippers pursuant to § 14101(b). *See* Consolidated Complaint at ¶¶ 96–101 (docket no. 69). Both of these allegations, however, appear to implicate rates. The gist of plaintiffs' contention is that, in the absence of capacity sharing and/or in the presence of more § 14101(b) contracts, the price of shipping would be lower. Such claim relies on shear speculation, not only as to the measure of damages, but also as to causation, and it embodies a key concern underlying the filed rate doctrine. *See County of Stanislaus*, 114 F.3d at 865 ("the only known rates are those that defendants filed" with the regulating agencies, and the calculation of damages "would require us to engage in the speculation that *Keogh* and its progeny forbid").

The authorities cited by plaintiffs do not support a different conclusion. For example, *Gallo* is distinguishable because, unlike this case, *Gallo* did not involve literally filed tariffs, and the surviving claims in *Gallo* were based on conduct affecting rates that were themselves outside the purview of the agency at issue. 503 F.3d at 1045–46 (rates for retail sales, "first sales," and fictitious sales are not regulated by FERC). Likewise, *Arroyo–Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56 (1st Cir.2005), is not on point. In *Arroyo–Melecio*, certain claims brought by consumers of compulsory automobile insurance were dismissed as precluded by the McCarran–Ferguson Act, which "exempts the 'business of insurance' from review under the federal antitrust laws to the extent that it is 'regulated by State law.'" *Id.* at 66 (quoting 15 U.S.C. § 1012(b)). The McCarran–Ferguson Act, however, contains an exception for boycotts, coercion, and intimidation. *Id.* (citing 15 U.S.C. § 1013(b)). In *Arroyo–Melecio*, the First Circuit concluded that one of the consumers' claims, namely that the defendant insurers had *inter alia* threatened clients of an insurance broker not to do business with the broker, fell within the boycott exception to the McCarran–Ferguson Act and should not have been dismissed. *Id.* at 69, 71. The First Circuit further observed that such boycott has "little to do with the filed rate doctrine." *Id.* at 73. It also has "little to do" with the issues in this case. The McCarran–Ferguson Act does not apply here, plaintiffs make no allegations in this case of any threats or boycotts, and plaintiffs' reason for citing *Arroyo–Melecio* remains a mystery.

Finally, *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993), to which plaintiffs make passing reference, *see* Response at 22 n. 10 (docket no. 94), has been discounted by the Ninth Circuit as irrelevant in circumstances analogous to those in this case. As explained in *County of Stanislaus*,

> The claims that survived dismissal in *Lower Lake Erie* have no relevance here. In that case, if the anticompetitive conduct had not occurred, an entirely new alternative—shipping by truck as opposed to rail—would have been available to the steel companies. The railroads' rates were only coincidentally implicated because "the steel companies were compelled to continue to pay the railroad fixed rates." In the instant case, by contrast, no matter what the reality of the alleged anticompetitive behavior, plaintiffs here would still be paying [the defendant's] rates. That those rates could theoretically be lower is precisely what compels application of the filed rate doctrine. *Lower Lake Erie* simply is not relevant.

114 F.3d at 865 (citation omitted). As in *County of Stanislaus* and in contrast to *Lower Lake Erie*, in this case, plaintiffs are not proposing some alternative mode of transportation or some drastic shift in the balance of market power; they are

simply identifying factors that might or might not have influenced defendants' rates. Plaintiffs' claims are more appropriately addressed to the STB.[11] *See DUX, Inc. v. CSX Lines, LLC,* Case No. C02–6740–RJK, Slip Op. at 3 (C.D.Cal. Jan. 24, 2003) (reprinted in Exh. B to Reply (docket no. 97)) ("Determining whether the rates and practices of an ocean carrier in the noncontiguous domestic trade are reasonable (*i.e.,* lawful) is a matter committed to the expertise of the STB."); *see also DHX, Inc.,* 501 F.3d at 1089 ("if the STB believed that the oligopolist shippers' pricing was aimed at eliminating competition in a manner harmful to consumers, the STB is empowered to step in and regulate any such anticompetitive behavior as part of its statutory responsibilities"); *cf. Matson,* 959 F.2d at 1043 (ratemaking is " 'an intensely practical affair' requiring the conversion of inexact data into exact rates

or limits upon rates," and an agency is accorded substantial deference as to rate-making in recognition of "both the difficulty of the task and the expertise of the agency performing it" (quoting *Puerto Rico Maritime Shipping Auth. v. Fed. Maritime Comm'n,* 678 F.2d 327, 335 (D.C.Cir.1982))).

### Conclusion

For the foregoing reasons, the Court GRANTS defendants' joint motion to dismiss, docket no. 86, on the grounds that the Consolidated Complaint does not sufficiently plead an antitrust claim and that, even if adequately pleaded, the current antitrust claim is barred by the filed rate doctrine. The Consolidated Complaint, docket no. 69, is DISMISSED without prejudice and with leave to amend within thirty (30) days of the date of this Order.[12] Any amended complaint must allege claims

---

**11.** At oral argument, plaintiffs asserted that the STB has not engaged in "meaningful review" of the fuel surcharges at issue and that, therefore, the filed rate doctrine does not apply, relying on *Brown v. Ticor Title Ins. Co.,* 982 F.2d 386 (9th Cir.1992), and *Wileman Bros. & Elliott, Inc. v. Giannini,* 909 F.2d 332 (9th Cir.1990). These cases are distinguishable. *Brown* involved state, as opposed to federal, regulatory schemes, and both cases dealt with "non-disapproval" regimes pursuant to which the agency did not and was not required to engage in antecedent review of the rate or standard at issue. *Brown,* 982 F.2d at 393 (the "Arizona and Wisconsin statutes do not provide for affirmative governmental approval"); *Wileman Bros.,* 909 F.2d at 338 (observing that "nondisapproval requires neither publication and comment nor explicit findings" and that "non-disapproval is equally consistent with lack of knowledge or neglect as it is with assent"); *see also McCray v. Fidelity Nat'l Title Ins. Co.,* 636 F.Supp.2d 322, 329 (D.Del.2009) ("Other than the Ninth Circuit in *Brown,* no other court has taken such a narrow view of the applicability of the filed rate doctrine."). In this matter, plaintiffs do not assert that the STB, a federal agency, lacks the authority to review the fuel surcharges. Indeed, as re-

cently as September 1998, the Government of the Territory of Guam ("GovGuam") filed a complaint with the STB, challenging the reasonableness of "rates, rules, classifications, and practices for all transportation by water" to and from Guam provided by Sea–Land Service, Inc. (now Horizon) and Matson. *Guam v. Sea–Land Serv., Inc.,* 2007 WL 295310(STB) (2007). The STB never reached the merits, however, because GovGuam voluntarily dismissed the proceedings. Plaintiffs' complaints about the manner in which the STB has or has not exercised its jurisdiction with regard to noncontiguous domestic shipping tariffs do not remove this case from the realm of the filed rate doctrine. *See In re Pa. Title Ins. Antitrust Litig.,* 648 F.Supp.2d 663, 670–71 (E.D.Pa.2009) (holding that "as long as the regulatory scheme requires the filing of rates with a government agency that has legal authority to review those rates, the filed rate doctrine applies regardless of the actual degree of agency review of those filed rates").

**12.** Plaintiffs have asked for permission to conduct discovery before amending their complaint. Plaintiffs' request is DENIED. *See Twombly,* 550 U.S. at 558–59, 127 S.Ct. 1955.

that are not barred by the filed rate doctrine and that are otherwise consistent with this Order.

IT IS SO ORDERED.