THE STATE OF NEVADA, IN ITS PROPRIETARY CAPACITY AND AS PARENS PATRIAE, BY AND THROUGH ITS ATTORNEY GENERAL; PEGGY MAZE JOHNSON AND LAUNA WILSON, INDIVIDUALLY AND AS CLASS REPRESENTATIVES FOR ALL OTHERS SIMILARLY SITUATED; AND LARRY LANCTO, INDIVIDUALLY AND AS CLASS REPRESENTATIVES FOR ALL OTHERS SIMILARLY SITUATED, APPELLANTS, *v.* RELIANT ENERGY, INC., A TEXAS CORPORATION; RELIANT RESOURCES, INC., A DELAWARE CORPORATION; CENTERPOINT ENERGY, INC., A TEXAS CORPORATION; AND KATHLEEN M. ZANABONI, AN INDIVIDUAL, RESPONDENTS.

No. 55752

September 27, 2012                    289 P.3d 1186

*Catherine Cortez Masto*, Attorney General, and *Eric P. Witkoski*, Chief Deputy Attorney General, Carson City; *James Tynan Kelly*, Houston, Texas, for Appellants the State of Nevada, Peggy Maze Johnson, and Launa Wilson.

*Boies, Schiller & Flexner LLP* and *Douglass A. Mitchell*, Las Vegas, for Appellant Larry Lancto.

*Snell & Wilmer, LLP*, and *D. Neal Tomlinson, Gregory A. Brower*, and *Richard C. Gordon*, Las Vegas; *Baker Botts, LLP*, and *J. Gregory Copeland* and *Mark R. Robeck*, Houston, Texas, for Respondents Reliant Energy, Inc.; Reliant Resources, Inc.; and Kathleen M. Zanaboni.

*Kemp, Jones & Coulthard, LLP*, and *William S. Kemp*, Las Vegas, for Respondent CenterPoint Energy, Inc.

# OPINION

By the Court, CHERRY, C.J.:

Due in part to significant manipulation of the natural gas markets from 2000 to 2001, gas and electricity prices skyrocketed in Nevada and other western states. This case arises out of the resulting energy crisis. In this case, appellants alleged that respondents, in violation of Nevada antitrust laws, conspired with the now-defunct Enron Corporation to drive up the price of natural gas in the Southern Nevada and Southeastern California markets. Appellants asserted that respondents engaged in rapid bursts of purchasing natural gas followed by rapid bursts of selling the same gas, which resulted in considerable profits for respondents and significantly higher prices for natural gas consumers. Appellants further alleged that respondents' plan for manipulating the markets worked because of a secret agreement with Enron that left respondents with greater profits from the sale of gas as well as ensured that respondents would always have a sufficient supply of natural gas. The district court ultimately dismissed the case, holding that the claims were barred by principles of federal preemption. We, like the district court, conclude that appellants' claim is preempted by federal law.

## FACTS

Gas and electric energy prices skyrocketed in western markets during an eight-month or longer period in 2000-2001. In response to these extraordinarily high prices, the Federal Energy Regulatory Commission (FERC) conducted an investigation. FERC staff found significant manipulation in the natural gas market, which also affected the electric energy market, but ultimately concluded that supply shortfalls and fatally flawed market design were the root causes of the markets' meltdowns.

Nevertheless, appellants the State of Nevada[2] and Peggy Maze Johnson, Launa Wilson, and Larry Lancto, as class representatives, filed suit in state district court against respondents Reliant Energy, Inc., a Texas Corporation; Reliant Resources, Inc.; CenterPoint Energy, Inc.; and Kathleen Zanaboni, a Reliant trader. Appellants asserted a single claim for antitrust violations under Nevada's Unfair Trade Practices Act (UTPA), NRS Chapter 598A, based on allegations that, between November 2000 and March 2001, Reliant, through Zanaboni, conspired with Enron to manipulate the natural gas market in order to obtain greater profits for itself while driving up natural gas prices for other consumers. Appellants claimed that, along the lines of what was described in the Federal Energy Regulatory Commission, *Final Report on Price Manipulation in Western Markets* (2003) (Final Report), Reliant engaged in this manipulation through high-volume, rapid-burst trading, often buying and selling many times its needs in quick bursts—an activity FERC termed churning—in order to artificially increase the overall market price of natural gas.[3] Further, appellants alleged, Reliant and Enron orally agreed to average the purchase prices and to separately average the sales prices and then net them against each other, which, due to the market's structure, ensured supply and resulted in profits to Reliant.

FERC determined that Reliant's sales were subject to its jurisdiction, but because FERC's regulations lacked explicit guidelines or prohibitions against Reliant's churning, its behavior was not in violation of FERC's regulations. *See* Final Report. In its Final Report, FERC recommended an amendment to the regulations to provide explicit guidelines or prohibitions to control the trading of natural gas.

Pointing to the FERC report, respondents separately moved to dismiss the complaint for, *inter alia*, failure to state a claim upon which relief can be granted, asserting that the UTPA claim was preempted by federal law. Zanaboni also moved to dismiss for lack of personal jurisdiction. Appellants opposed these motions to dismiss.

---

[2] The State of Nevada sued in its proprietary capacity as a direct or indirect purchaser of natural gas and natural gas transportation services and also in its capacity as parens patriae on behalf of the residents of the areas of Southern Nevada who are direct or indirect purchasers of delivered natural gas services.

[3] "In churning, volumes of natural gas are sequentially bought and sold by a trader and counterparty so that each time a buy/sell cycle is complete, the basis price has been incrementally increased without the net exchange of any actual natural gas." *Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 849 (Tenn. 2010) (internal quotations omitted). "Basis is the difference between the commodity price of natural gas as quoted on the New York Mercantile Exchange and the price paid for natural gas at the California border. Thus, basis generally reflects the cost of transportation." *E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1032 n.2 (9th Cir. 2007).

The district court granted the motions to dismiss, determining that Nevada's UTPA did not apply because the alleged misconduct in the natural gas market is governed by federal law and, thus, the claim was preempted. The district court further determined that it did not have jurisdiction over Zanaboni because sufficient contacts with Nevada had not been established.

Appellants then filed a motion to alter or amend the dismissal order for two reasons—(1) the court had expressly relied on federal decisions that were later reversed and vacated, and (2) recent caselaw demonstrated that FERC does not have exclusive jurisdiction over the wholesale natural gas market; consequently, the State of Nevada is not prohibited from applying its antitrust laws to respondents' conduct. Respondents opposed the motion. The district court denied the motion, and this appeal followed.[4]

## DISCUSSION

*Standard of review*

This court reviews de novo an order granting an NRCP 12(b)(5) motion to dismiss, accepting all factual allegations in the complaint as true, and drawing all inferences in the plaintiffs' favor. *Buzz Stew, LLC v. City of N. Las Vegas*, 124 Nev. 224, 227-28, 181 P.3d 670, 672 (2008). We will uphold an order of dismissal when it appears beyond a doubt that the plaintiff could prove no set of facts that would entitle him or her to relief. *Id.* We also review de novo the district court's preemption analysis. *See Nanopierce Tech. v. Depository Trust*, 123 Nev. 362, 370, 168 P.3d 73, 79 (2007).

Appellants' claim arises under Nevada's UTPA, which is codified in NRS Chapter 598A. In particular, appellants assert that respondents' alleged price-fixing activities violated NRS 598A.060(1). Respondents contend, however, that because FERC was conferred with exclusive jurisdiction to ensure that the interstate sales of natural gas have just and reasonable rates, appellants' claim is preempted by federal law.

---

[4]Respondents assert that this appeal is untimely because the district court treated the motion to alter or amend as one for reconsideration, and under prior decisional law, motions for reconsideration did not toll the appeal period. *See Alvis v. State, Gaming Control Bd.*, 99 Nev. 184, 186 n.1, 660 P.2d 980, 981 n.1 (1983), *disapproved of by AA Primo Builders v. Washington*, 126 Nev. 578, 585, 245 P.3d 1190, 1195 (2010). Recently, however, we determined that, in most circumstances, there is no valid basis for distinguishing the two types of motions, and thus, timely filed motions for reconsideration may toll the appeal period. NRAP 4(a)(4); *AA Primo Builders*, 126 Nev. at 583-84, 245 P.3d at 1194-95. Accordingly, regardless of whether the motion merely sought "reconsideration," this appeal is timely, and we have jurisdiction.

*Federal preemption*

The doctrine of preemption arises from the United States Constitution's Supremacy Clause. *Nanopierce*, 123 Nev. at 370, 168 P.3d at 79. Under the Supremacy Clause, federal law preempts state law when Congress expressly so provides, or when the state law conflicts with the terms or purposes behind federal law. *Id.* at 370-71, 168 P.3d at 79. Because federal law does not contain an express provision preempting state antitrust law in this instance, only implied preemption is at issue here.

There are two types of implied preemption: field preemption and conflict preemption. *Id.* at 371-72, 168 P.3d at 79-80. The parties' arguments here concern the first type, field preemption. Field preemption occurs "when congressional enactments so thoroughly occupy a legislative field, or touch a field in which the federal interest is so dominant, that Congress effectively leaves no room for states to regulate conduct in that field." *Id.* at 371, 168 P.3d at 79. Thus, we examine "the entire regulatory scheme . . . to determine whether, based on its level of comprehensiveness or the nature of the field regulated, Congress intended to preclude states from also imposing requirements on that field." *Id.* at 371, 168 P.3d at 79-80. If so, state law is preempted regardless of conflict. *Id.*

Appellants argue that field preemption is inapplicable to this case because even though the field historically had been preempted, at the time of the alleged market manipulation, the field had been deregulated and was no longer subject to FERC control. Respondents counter that deregulation of a federally controlled field does not, without more, demonstrate Congressional intent to allow states to then regulate the field.

To determine whether congressional deregulation of natural gas sales means that state regulation of such sales is permissible, we review the historical background of federal regulation over the transportation and sale of natural gas, which has been set forth in large part by the Ninth Circuit Court of Appeals in *E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1036 (9th Cir. 2007), and other courts that have addressed related issues.

*The federal energy regulatory system*

The natural gas market has traditionally consisted of three segments—producers at the natural gas wellhead, interstate pipelines that transport the gas from the wellhead to local distributers around the country, and local distributors who sell the gas to consumers. *In re Hawaiian & Guamanian Cabotage Antitrust*, 647 F. Supp. 2d 1250, 1264 (W.D. Wash. 2009) (citing *E. & J. Gallo Winery v. Encana Corp.*, 503 F.3d 1027, 1036 (9th Cir. 2007)). Because the

interstate pipelines controlled the gas's transportation, they developed monopoly power over both natural gas purchases from the wellhead and sales to local distribution companies. *Gallo,* 503 F.3d at 1036 (citing *General Motors Corp. v. Tracy,* 519 U.S. 278, 283 (1997)).

During the Great Depression, Congress passed the Natural Gas Act (NGA), Pub. L. No. 75-688, 52 Stat. 821 (1938) (codified as amended at 15 U.S.C. § 717 (2006)), thereby conferring upon FERC jurisdiction over wholesale rates charged by producers and sale-for-resale rates charged by interstate pipelines in an attempt to curb the market power of interstate pipelines. *Hawaiian,* 647 F. Supp. 2d at 1264 (citing *Gallo,* 503 F.3d at 1036). The NGA required natural gas companies to file their rates for transportation and sale with FERC, which then was authorized to determine the lawfulness of the rates under the NGA requirement that the natural gas rates "shall be just and reasonable." 15 U.S.C. § 717c(a) (2006); *Gallo,* 503 F.3d at 1034. This procedure gave rise to the filed-rate doctrine, under which federal courts, and state courts through preemption principles, were precluded from awarding damages that would, in essence, alter the FERC-approved rate. *Gallo,* 503 F.3d at 1034-35.

In 1963, the Supreme Court explained in *Northern Gas Co. v. Kansas Commission* that the NGA is "a comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce,' " 372 U.S. 84, 91 (1963) (quoting *Phillips Petroleum Co. v. Wisconsin,* 347 U.S. 672, 682 (1954)), and articulated that no room has been left "either for direct state regulation of the prices of interstate wholesales of natural gas, *Natural Gas Pipeline Co. v. Panoma Corp.*, 349 U.S. 44 [(1955)], or for state regulations which would indirectly achieve the same result." 372 U.S. at 91.

The federal regulatory system was overburdened, however, and together with FERC's imposition of low price ceilings on wellhead sales, it led to natural gas shortages in the 1970s. *Gallo,* 503 F.3d at 1036. These natural gas shortages prompted Congress to deregulate the industry. *Id.* at 1036-37; *Hawaiian,* 647 F. Supp. 2d at 1264. To do so, Congress passed the Natural Gas Policy Act of 1978 (NGPA), Pub. L. No. 95-621, 92 Stat. 3350 (1978) (codified as amended at 15 U.S.C. §§ 3301-3432 (2006)), which removed the low price ceilings on wellhead sales, instead imposing maximum price ceilings. Regarding the NGPA's effect on field preemption, the Supreme Court confirmed in a 5-4 decision in *Transcontinental Pipe Line v. State Oil & Gas Board* that, based on content and legislative history, the NGPA did not signal a retreat from comprehensive federal gas policy and, "in some respects expanded federal control, since it granted FERC jurisdiction over the intrastate market for the first time." 474 U.S. 409, 421 (1986) (cit-

ing 15 U.S.C. §§ 3371-3372). The Court determined that " '[a] federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated, and in that event would have as much pre-emptive force as a decision *to* regulate.' " *Id.* at 422 (quoting *Arkansas Elec. Coop. v. Ark. Public Serv. Comm'n*, 461 U.S. 375, 384 (1983)). Accordingly, the NGPA did not eliminate field preemption over natural gas sales.

Later, in 1989, Congress removed FERC's ability to set prices on wellhead sales (or "first sales"[5]) altogether when it enacted the Natural Gas Wellhead Decontrol Act of 1989 (WDA), Pub. L. No. 101-60, 103 Stat. 157 (1989). By eliminating FERC's authority to set prices of wellhead sales, Congress subjected such sales to market forces. *Gallo*, 503 F.3d at 1037; *see also Hawaiian*, 647 F. Supp. 2d at 1264. Despite the deregulation of first sales, however, interstate pipelines apparently "continued to 'bundle' their transportation service with their own natural gas sales and require customers to purchase both." *Gallo*, 503 F.3d at 1037. As a result, customers were unable to benefit from market competition at the wellhead. *Id.* at 1037-38.

FERC also began to implement deregulation policies to address these issues. FERC issued Order 636, now codified at 18 C.F.R. §§ 284.281-.288, requiring the interstate pipelines to separate transportation services from gas sales and "issuing 'blanket sale' certificates to interstate pipelines, allowing them to sell unbundled natural gas at market-based rates." *Hawaiian*, 647 F. Supp. 2d at 1264 (citing *Gallo*, 503 F.3d at 1038). In Order 636, FERC explained that it was " 'instituting light-handed regulation, relying upon market forces at the wellhead or in the field to constrain unbundled pipeline sale for resale gas prices within the NGA's "just

---

[5]A first sale is

    any sale of any volume of natural gas—

        (i) to any interstate pipeline or intrastate pipeline;

        (ii) to any local distribution company;

        (iii) to any person for use by such person;

        (iv) which precedes any sale described in clauses (i), (ii), or (iii); and

        (v) which precedes or follows any sale described in clauses (i), (ii), (iii), or (iv) and is defined by the Commission as a first sale in order to prevent circumvention of any maximum lawful price established under this chapter.

    (B) Certain sales not included

Clauses (i), (ii), (iii), or (iv) of subparagraph (A) shall not include the sale of any volume of natural gas by any interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof, unless such sale is attributable to volumes of natural gas produced by such interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof.

15 U.S.C. § 3301(21).

and reasonable'' standard.' '' *Gallo*, 503 F.3d at 1042 (quoting Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 57 Fed. Reg. 13,267, 13,297 (April 16, 1992) (codified at 18 C.F.R. pt. 284)). FERC also began issuing blanket certificates[6] for sales for resale, meaning that those sales, like wellhead sales, would be subject to market prices. *Id.* at 1038 (citing Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol, 57 Fed. Reg. at 13,270).[7]

Commencing in the summer of 2000, both natural gas and electricity prices dramatically rose at the California border markets, in part because of widespread manipulation by energy traders. *Gallo*, 503 F.3d at 1031; *see* Final Report. After FERC completed an investigation in 2003, it noted that ''there was neither a formal process . . . nor any oversight by [FERC]'' for the price calculation of natural gas, and it concluded in its Final Report that the information being used to generate the natural gas ''market'' prices ''was reported in a less than meticulous manner,'' that the price indices were ''ripe for manipulation,'' and that market participants had actually engaged in misconduct, including providing ''false reports of natural gas prices and trade volumes.'' *Id.* at 1031-32 (citing Final Report).

After the period at issue in this case, FERC revised its blanket market certificates to clearly prohibit anticompetitive behavior and market abuses. *Gallo*, 503 F.3d at 1038 (citing Amendments to Blanket Sales Certificates, 68 Fed. Reg. 66,323 (Nov. 17, 2003) (codified at 18 C.F.R. pt. 284)). This alteration was based on FERC's determination that price manipulation had occurred in prior years. *Id.*

---

[6]The NGA required natural gas companies to have a certificate of public convenience and necessity issued by FERC before they could engage in sales for resale within FERC's jurisdiction. 15 U.S.C. § 717f(c)(1)(A) (2006). However, FERC decided to issue blanket certificates authorizing pipelines and other persons selling natural gas to make wholesale sales at negotiated or market-based rates and freed the blanket certificate holders from ''other regulation under the Natural Gas Act jurisdiction of [FERC].'' 18 C.F.R. § 284.402(a) (2012); *see* 18 C.F.R. § 284.284(a) (2012). These ''blanket certificates were issued by operation of the rule itself and there was no requirement for persons to file applications seeking such authorization.'' Amendments to Blanket Sales Certificates, 68 Fed. Reg. 40,207, 40,208 (June 26, 2003) (codified at 18 C.F.R. pt. 284).

[7]It is notable that after deciding to issue blanket certificates, FERC advised the industry that it would use the complaint process to continue to '' 'monitor the operation of the market.' '' *Gallo*, 503 F.3d at 1038 (quoting Prevailing Rate Systems, 57 Fed. Reg. 57,875, 57,958 (Dec. 8, 1992) (codified at 5 C.F.R. pt. 532)). On occasion, FERC exercised this oversight authority. *Id.* (citing *Enron Power Mktg., Inc.*, 103 Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,343, at ¶ 72 (2003) (revoking Enron's blanket market certificate)); *see also* Order Directing Staff Investigation, 98 F.E.R.C. ¶ 61,165 (2002) (ordering an investigation into short-term price manipulation in electric energy and natural gas markets in the western United States).

*Application of Nevada's UTPA*

With this history in mind, we now examine the law on preemption and flesh out whether Nevada's UTPA can be applied in this case.

This particular issue has been analyzed by the Tennessee Supreme Court in *Leggett v. Duke Energy Corp.*, 308 S.W.3d 843 (Tenn. 2010), and by the Ninth Circuit Court of Appeals in *E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027 (9th Cir. 2007), with vastly different results.

We find the reasoning in *Leggett* to be more persuasive. In *Leggett*, a class action antitrust suit, the defendants, including Reliant, were alleged to have participated in various anticompetitive practices to artificially inflate the price of wholesale natural gas, "including making false statements about natural gas transactions and engaging in 'wash trades'[8] and 'churning.'" 308 S.W.3d at 848. The plaintiffs claimed that, in light of the deregulation of the natural gas industry, preemption did not apply to their claims because they arose in part from transactions that were not within FERC's jurisdiction. *Id.* at 864-65. The court, while acknowledging that deregulation complicated the inquiry, disagreed. *Id.* at 865. It noted that because deregulation ensures "that an industry is not overburdened by an 'intricate web' of restrictive requirements[,] . . . the scope and complexity of the relevant federal statutes are less helpful indicators of congressional intent than they would ordinarily be." *Id.* at 866. The court indicated that because of this circumstantial difficulty, congressional intent must be ascertained from other indicators. *Id.*

The *Leggett* court explained that because it was well-established "that Congress had enacted broad field pre-emption prior to the WDA," the question was "whether Congress repealed or reduced the scope of the pre-emptive regime, not whether it intended to implement an entirely new system of pre-emption." *Id.* The court determined that "in this case, the WDA, when read in the context of the NGA and NGPA—altogether precludes states from regulation." *Id.* In so concluding, the court quoted the United States Supreme Court's observation in *Transcontinental Pipe Line v. State Oil & Gas Board (Transcon)* concerning the NGPA:

> The aim of federal regulation remains to assure adequate supplies of natural gas at fair prices, but the NGPA reflects a

---

[8] "A wash trade is a transaction where two parties simultaneously buy and sell the same quantity of natural gas at the same price and on the same day. This creates a false appearance of demand for and short supply of natural gas." *Gallo*, 503 F.3d at 1032 n.3.

> congressional belief that a new system of natural gas pricing was needed to balance supply and demand. The new federal role is to "overse[e] a national market price regulatory scheme." The NGPA therefore does not constitute a federal retreat from a comprehensive gas policy.

*Leggett*, 308 S.W.3d at 866 (quoting *Transcon*, 474 U.S. 409, 421 (1986)). "In other words, the purpose of the NGPA was not to withdraw from the regulation of the wholesale natural gas market, but instead to replace the older, more direct method of exercising that responsibility with a newer, more hands-off approach." *Id.* The *Leggett* court applied this logic to the WDA and concluded that Congress was again trying to deregulate but was not putting an end to federal oversight. *Id.* The court concluded that these mere changes in approach did not contract the scope of preemption, as FERC has continued to regulate and refine the pricing policy since the WDA. *Id.* at 866-67. "A tool has merely been eliminated by the Congress—the ability to regulate directly the price of first sales—just as Congress eliminated the direct regulation of the first sale price of new and high-cost gas in the NGPA." *Id.* at 867. The court further concluded that since Congress intended for the WDA to deregulate the market, it would be nonsensical "to conclude that Congress simultaneously intended to expand states' authority to regulate that same market" when "nothing . . . suggests a congressional aim to benefit the market by yielding to more intrusive legislation by the states." *Id.*

It has often been stated that the act of deregulation has the same preemptive force as regulation. *See Transcon*, 474 U.S. at 415 (citing *Arkansas Elec. Coop. v. Ark. Public Serv. Comm'n*, 461 U.S. 375, 384 (1983)). The decision to deregulate was not a decision to no longer occupy the field. *See id.* at 422 (concluding that limiting FERC's power to regulate specific aspects of the first sale of gas was a result of Congress's desire to leave price and supply determinations of some first sales to the market). FERC used deregulation as a means to increase market competition. It did not use this tool as a means to open up regulation to all 50 states.

The Ninth Circuit, in *Gallo*, conducted the same analysis as *Leggett* but ultimately came to a different result. In *Gallo*, the appellant alleged that the defendants violated state and federal antitrust laws and thereby inflated the price that the appellant had paid for natural gas. *Id.* at 1030. The claims involved "engag[ing] in a number of illegal practices designed to manipulate the indices, including agreeing to set . . . natural gas [prices] at an inflated rate, misreporting natural gas prices paid to the indices, and engaging in 'wash trades.'" *Id.* at 1032. Gallo sought to recover

damages for the amount that it was overcharged through the use of a hypothetical fair index price. *Id.*

In its analysis, the Ninth Circuit determined that field preemption does not bar the damages claims. *Id.* at 1046. The court pointed out that Congress is presumed to know the existing state and federal law governing antitrust and damages claims, and that such laws of general applicability are ordinarily not preempted. *Id.* Using these principles, the *Gallo* court concluded that neither the NGPA nor the WDA "includes language suggesting that Congress intended to displace state antitrust or damage laws by withdrawing first sales from the NGA." *Id.* The court reasoned that because Congress did not expressly preempt state claims, preemption was not intended. *Id.* The Ninth Circuit determined that state and federal antitrust and fair competition laws "complement rather than undermine" Congress's goal to move toward a less-regulated market for natural gas. *Id.* The court concluded that, because lawsuits were part of the market forces to which Congress subjected first sales, the antitrust and damages claims were not barred by preemption: "[j]ust as Congress's direction to FERC to determine just and reasonable rates gave rise to the inference that Congress preempted damage claims per the Filed Rate Doctrine, the withdrawal of FERC's authority to determine such rates gives rise to the opposite inference, that normal market forces, including the tug and pull of private lawsuits, will hold sway." *Id.*[9]

We cannot agree. As pointed out in *Leggett*, the conclusion that there is no preemption leads to the imposition on interstate natural gas wholesalers 50 different sets of state rules concerning anticompetitive behavior. 308 S.W.3d at 869. To allow intervention by the states would devastate "two of the additional purposes of the federal statutory scheme: national uniformity and freedom from burdensome government intervention." *Id.* at 868-69. From a practical standpoint, if each state intervened in this field with different regulations, the result would be a maelstrom of competing regulations that would hinder FERC's oversight of the natural gas market. We cannot conclude that this is what Congress intended through the use of purposeful deregulation. State antitrust law cannot coexist peacefully with the natural gas federal regulations. Accordingly, we conclude that even if Nevada's UTPA is complementary to the federal regulatory scheme, it nonetheless improperly encroaches upon the field.

We thus conclude that the district court was correct to dismiss this case, as appellants' claims are barred by federal field preemption. While this conclusion fails to provide redress for our cit-

---

[9]While the Ninth Circuit in *Gallo* went on to focus its attention on the filed-rate doctrine, we conclude that the filed-rate doctrine is inapplicable in light of our conclusion that the field is preempted. 503 F.3d at 1041-42.

izens, the long and entangled history of natural gas regulation in this country requires this result. Because Congress has afforded no room for the imposition of state-law requirements, federal preemption bars this action.

## CONCLUSION

Because the claims under the UTPA are preempted by federal law, appellants have not stated a claim upon which relief can be granted. Accordingly, the district court properly dismissed appellants' complaint.[10]

DOUGLAS, SAITTA, GIBBONS, PICKERING, and HARDESTY, JJ., concur.

---

[10]All other arguments raised on appeal either lack merit or are rendered moot by this disposition.